FOX, Justice.
[¶1] Fourth Quarter Properties 86 (FQP), a Georgia LLC, and its sole member, Stanley E. Thomas, obtained a $30-million loan from MetLife Insurance (MLIC), with the Little Jennie Ranch in Sublette County as collateral. Mr. Thomas signed for the loan and mortgage on behalf of himself and on behalf of FQP. When they could no longer make the payments, MLIC obtained a judgment against FQP and Mr. Thomas for the outstanding balance, plus interest (the "Wyoming Judgment"). On the eve of the foreclosure sale, however, FQP filed for bankruptcy protection in Georgia. In the bankruptcy case, FQP agreed to repay MLIC a reduced amount for the outstanding Wyoming Judgment, and MLIC agreed to allow FQP more time to sell the ranch. When FQP was unable to sell the ranch, MLIC proceeded with the foreclosure sale and ultimately purchased the ranch at the sale. MLIC then sold its rights to the ranch and the remaining balance on the Wyoming Judgment to JLC, the appellee in this case. In the district court, JLC obtained a deficiency judgment against Mr. Thomas for the unpaid amount of the Wyoming Judgment, approximately $10-million.
*107 The issue on appeal is whether Mr. Thomas, who was not a party to FQP's bankruptcy case, was entitled to the reduced amount FQP negotiated with MLIC in the bankruptcy case. We conclude that he was not. However, we also conclude that the district court failed to properly credit Mr. Thomas for prior payments he and FQP made against the Wyoming Judgment and, thus, we affirm in part, reverse in part, and remand for further proceedings.
ISSUES
[¶2] We rephrase the issues as:
1. Did the bankruptcy court's Consent and Confirmation Orders in the FQP bankruptcy alter Mr. Thomas's liability for the Wyoming Judgment?
2. Was JLC's motion for a deficiency judgment barred by res judicata based on the bankruptcy court's Consent and Confirmation Orders?
3. Did the district court err when it did not credit Mr. Thomas with the $3-million February 2014 payment against the Wyoming Judgment?
FACTS
[¶3] On December 18, 2006, Mr. Thomas, individually, and as the sole member of his company, FQP, obtained a loan from MLIC for $30-million.[1] Mr. Thomas, individually and as the sole member of FQP, signed a promissory note and granted MLIC a mortgage on the Little Jennie Ranch in northern Sublette County.
[¶4] After Mr. Thomas and FQP defaulted on the loan, MLIC sought to foreclose on the Little Jennie Ranch. On November 15, 2013, the district court granted MLIC summary judgment for a total of $31,948,180.15 against Mr. Thomas and FQP "jointly and severally," which was to accrue interest at $9,144.17 per day until they paid the judgment in full. MLIC vacated the foreclosure sale set for February 14, 2014, and instead entered into another agreement with Mr. Thomas and FQP that required them to make three payments of $3-million on or before January 15, 2015, and monthly payments of $237,230.77. Mr. Thomas and FQP made two of these $3-million payments, including one in February 2014. MLIC filed a Notice of Partial Satisfaction of Judgment that reflected the February 2014 payment. When Mr. Thomas and FQP failed to meet their remaining obligations under the new agreement, however, MLIC scheduled another foreclosure sale for January 23, 2015.
[¶5] On January 22, 2015, FQP filed for Chapter 11 bankruptcy protection in Georgia, and the automatic stay requirements of 11 U.S.C. § 362 prevented the foreclosure sale. In response, MLIC filed a claim in bankruptcy court for $27,925,194.25 as the outstanding balance on the Wyoming Judgment. This amount credited Mr. Thomas and FQP with only one of the two $3-million payments they had made. FQP argued that based on its calculations, it only owed $24,232,222.67.
[¶6] Eventually, MLIC and FQP agreed to allow MLIC a secured claim of $26,817,815.96. On December 2, 2015, the bankruptcy court entered a Consent Order reflecting this amount and gave FQP until October 31, 2016, to sell the Little Jennie Ranch, after which the automatic stay would expire. The only provision of the Consent Order that mentioned Mr. Thomas was Paragraph 22, which required that he and FQP vacate the property on October 31, 2016.
[¶7] On March 15, 2016, at the conclusion of the bankruptcy process, the bankruptcy court entered a Confirmation Order confirming FQP's Plan of Reorganization, with some modifications based on MLIC's objections to FQP's proposed plan. In the Confirmation Order, MLIC reserved its rights against Mr. Thomas under the Wyoming Judgment:
3.2.3 Treatment of Claims in Class 2 . The Allowed Secured Claims of [MLIC] in the stipulated amount of $26,817,815.96 as of the Petition Date, plus interest at the non-default rate of 5% per annum accrued from the Petition Date to the Closing Date, plus post-petition reasonable attorney's fees and costs ..., collateralized by a security interest in the Real Property is included in *108 Class 2 [the Little Jennie Ranch] and shall be paid in full on the Effective Date from the Net Proceeds from the sale of the Real Property. ... No Provision of this Plan shall impair the credit bid rights of ... [MLIC] [.] Except as provided in Section 4.2.9 of the Plan, and in this Order, the Plan shall not be deemed or construed to impair the rights, powers, or remedies available to the Class 2 claimant [MLIC], whether under the Class 2 claimant's loan, transaction documents, or Pre-Petition Wyoming Judgment, at law, or in equity, against any non-debtor (including, without limitation, any co-maker of any note, any guarantor, or any other co-obligor of the Debtor) with respect to the indebtedness giving rise to the Allowed Class 2 Claim.
(Emphasis added.)
[¶8] Section 4.2.9, known as a "Channeling Injunction," provided:
4.2.9 Channeling Injunction Prohibiting Collection Action Against Guarantors and Affiliates and Prohibiting dissipation of assets by Guarantor During Plan Consummation . Commencing as of the Confirmation Date and ... until further order of the Bankruptcy Court, all Holders of Allowed Guarantor Claims in Class 2 [i.e., MLIC] that are designated to be paid in full on the Effective Date from the Net Proceeds of the sale of the Real Property [i.e., the Little Jennie Ranch], shall look solely to the provisions of this Plan for payment of their Allowed Guarantor Claims, and are hereby restrained and enjoined from pursuing or continuing collection of any Allowed Guarantor Claim against Guarantor [i.e., Mr. Thomas] or any Affiliate. Until all such Allowed Guarantor Claims provided for under this Plan which have been guaranteed by Guarantor are paid in full, or until further order of the Bankruptcy Court, Guarantor is hereby restrained and enjoined from transferring any interest in real or personal property not in the ordinary course of business ... or otherwise ... that impairs the post-judgment remedies of ... [MLIC]. In furtherance of such injunction, ... [MLIC] shall, with respect to Guarantor or Affiliate, make any demand ... commence or continue any ... judicial ... foreclosure ... of any real or personal property of Guarantor.
[¶9] The basis for this Channeling Injunction was the bankruptcy court's finding that FQP and Mr. Thomas "share an identity of interest, such that a suit against [Mr. Thomas] ... is, in essence, a suit against [FQP] and would impair their ability to fund operating shortfalls, thereby jeopardizing consummation." In essence, it prevented MLIC from attempting to satisfy its Wyoming Judgment against Mr. Thomas until "further order of the Bankruptcy Court," because such an attempt could interfere with FQP's ability to satisfy its obligations under the Plan.
[¶10] FQP and Mr. Thomas were unable to sell the ranch before October 31, 2016. In November 2016, the bankruptcy court lifted the stay and, on January 6, 2017, the ranch was sold at a foreclosure auction, and MLIC was the highest bidder with its $26,857,929.42 judgment bid.[2] On January 18, 2017, the district court entered an order confirming the foreclosure sale and MLIC's winning bid. In March 2017, MLIC assigned its rights to the ranch and the Wyoming Judgment to JLC, the appellee in this case.
[¶11] On October 12, 2017, JLC filed a motion for a deficiency judgment against Mr. Thomas for the outstanding balance on the Wyoming Judgment, plus interest. As of August 31, 2017, this amount was $10,111,714.21. JLC filed an affidavit from its financial advisor that listed the Wyoming Judgment amount, added costs and attorney fees the district court awarded in its summary judgment order, and then credited Mr. Thomas with only one $3-million payment and other payments Mr. Thomas and FQP had made against the Wyoming Judgment since 2013. It also credited Mr. Thomas with MLIC's $26,857,929.42 credit bid for the ranch.
*109 [¶12] Mr. Thomas argued that the bankruptcy court's Consent and Confirmation Orders constituted a novation of the original loan agreement and that he only owed the reduced amount in FQP's bankruptcy court Consent Order-which MLIC used as its credit bid. Thus, he maintained that the outstanding balance was only $993,810.26, which was the accumulated interest from October 31, 2016. He also asserted that res judicata precluded JLC's deficiency judgment for much the same reason. The following table illustrates the difference between the parties' calculations following the Wyoming Judgment and FQP's bankruptcy case:
MLIC/JLC Mr. Thomas Explanation 1/22/2015: Balance $31,377,481.94 $26,817,515.96 MLIC/JLC used when FQP filed for amount from bankruptcy Wyoming Judgment Mr. Thomas used amount FQP obtained in Consent Order Interest from $6,538,081.55 $2,622,973.48 MLIC/JLC used 1/22/15 (date of 11% rate from bankruptcy filing) Wyoming Judgment through 1/6/2017 (date of foreclosure Mr. Thomas used sale) 5% rate from Consent Order Interest from date $674,080.14 $31,250.24 MLIC/JLC used of foreclosure sale 11% rate from through August 31, Wyoming Judgment 2017 (date JLC used in its motion for the deficiency Mr. Thomas used judgment) 5% rate from Consent Order Interest Payments $1,620,000 $1,620,000 Same Foreclosure Bid $26,857,929.42 $26,857,929.42 Same Balance $10,111,714.21 $993,810.26
[¶13] The district court agreed with JLC and entered a deficiency judgment against Mr. Thomas for $10,111,714.21, with interest accruing at 11%-the default rate under the original note. It concluded that the Consent and Confirmation Orders did not "affect [Mr.] Thomas' liability," and that res judicata did not apply because Mr. Thomas was not a party to FQP's bankruptcy case. This appeal followed.
DISCUSSION
[¶14] Mr. Thomas argues that he is entitled to the reduced balance on the Wyoming Judgment that FQP obtained in its bankruptcy. He contends that he was an intended beneficiary of the Consent and Confirmation Orders due to his intimate involvement in FQP's bankruptcy case and certain provisions in those orders. He also asserts that the Consent and Confirmation Orders novated the original note and, in the alternative, res judicata barred JLC's motion for a deficiency judgment. Finally, he maintains that, even if we disagree with his other arguments, the district court erred when it did not properly credit him with the $3-million February 2014 payment MLIC received.
I. Standard of Review
[¶15] Mr. Thomas appeals the district court's order granting JLC's motion for a deficiency judgment against him. We have never addressed the appropriate standard of review for a deficiency judgment. See Walker v. McAnnany , 802 P.2d 876 (Wyo. 1990) (considering *110 the appeal of a deficiency judgment without stating a standard of review). We have applied our normal standard for reviewing summary judgment orders in cases where a party filed a complaint for a deficiency judgment and then filed a motion for summary judgment. See Kilmer v. Citicorp Mortg., Inc. , 860 P.2d 1165, 1166 (Wyo. 1993) ; Hess v. Thomas , 851 P.2d 10, 11 (Wyo. 1993). In this case, however, JLC filed its motion for a deficiency judgment within the same foreclosure case MLIC started in 2013 and did not file a subsequent summary judgment motion.[3]
[¶16] The district court ordered on summary judgment that MLIC was entitled to a deficiency judgment for the difference between the proceeds of the sale of the ranch and MLIC's judgment. The foreclosure statutes require that a mortgagor (Mr. Thomas) "is liable for any deficiency." Wyo. Stat. Ann. § 34-4-113(c) (LexisNexis 2017). MLIC used the amount it negotiated with FQP in the bankruptcy case as its credit bid at the foreclosure sale.[4] Mr. Thomas's argument, below and on appeal, is that there was no deficiency because he was entitled to the same amount FQP negotiated through the bankruptcy process.
[¶17] Mr. Thomas asserts that we should apply our summary judgment standards to the issues in this case. Both parties agree that this involves the interpretation of the Consent and Confirmation Orders, which are interpreted like a contract. We review issues of contract interpretation de novo. E.g. , Pope v. Rosenberg , 2015 WY 142, ¶ 21, 361 P.3d 824, 830-31 (Wyo. 2015) (citation omitted). Either approach results in de novo review, and we agree that is the applicable standard under the circumstances of this case.
II. The bankruptcy court's Consent and Confirmation Orders in the FQP bankruptcy did not alter Mr. Thomas's liability for the Wyoming Judgment.
[¶18] The two operative documents are the bankruptcy court's Consent Order and the Confirmation Order. A Consent Order is like a consent decree. See City of Covington v. Covington Landing Ltd. P'ship , 71 F.3d 1221, 1227 (6th Cir. 1995). " 'A consent decree [judgment] ... is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.' " Day v. Davidson , 951 P.2d 378, 382 (Wyo. 1997) (quoting Rufo v. Inmates of Suffolk Cty. Jail , 502 U.S. 367, 378, 112 S.Ct. 748, 757, 116 L.Ed.2d 867, 883 (1992) ) (alteration in original).
[¶19] We interpret consent decrees, and by extension consent orders, like a contract. See In re CDR , 2015 WY 79, ¶ 24, 351 P.3d 264, 269-70 (Wyo. 2015) ; see also In re Reflections , 1995 WL 295502, at *2 (4th Cir. 1995) ("A consent order ... is the product of a settlement-a contract-between the parties."). Similarly, a Confirmation Order is an order by the bankruptcy court that formally approves a debtor's "Plan of Reorganization," and, occasionally, amends certain provisions of the proposed plan. See generally Markstein v. Countryside I, L.L.C. , 2003 WY 122, ¶ 21, 77 P.3d 389, 396 (Wyo. 2003) ; Nauman v. CIT Group/Equipment Financing, Inc. , 816 P.2d 883, 885 (Wyo. 1991). We also interpret it as a contract. In re Dow Corning Corp. , 456 F.3d 668, 676 (6th Cir. 2006) (citations omitted).[5] "[W]e interpret *111 [the] contract as a whole, reading each provision in light of all the others to find their plain meaning." James v. Taco John's Int'l, Inc. , 2018 WY 96, ¶ 12, 425 P.3d 572, 578 (Wyo. 2018) (alteration in original). We interpret the contract in a manner that gives each part meaning, and "avoid" interpreting it in a way that leaves some part "meaningless" or "inconsistent" with any other provision. Id. (citation omitted).
[¶20] Mr. Thomas argues that he is subject to the Consent and Confirmation Orders, even though only MLIC and FQP were parties to these documents in the bankruptcy case. Nevertheless, he contends that the Confirmation and Consent Orders "show[ ] an express intent of the parties-including [Mr.] Thomas-as well as the Bankruptcy Court, to bind [Mr.] Thomas and MLIC (and its assignee JLC) to the terms of those orders[.]"
[¶21] Mr. Thomas is not entitled to the benefits FQP obtained through the bankruptcy process for the simple reason that Mr. Thomas was not a party to that case. Before FQP's bankruptcy filing, MLIC held a judgment against Mr. Thomas and FQP, "jointly and severally." See GreenHunter Energy, Inc. v. Western Ecosystems Technology, Inc. , 2014 WY 144, ¶ 12, 337 P.3d 454, 459 (Wyo. 2014) ("Certain legally recognized entities, such as corporations and limited liability companies, are separate and distinct from their owners.") (citations omitted). It was FQP and not Mr. Thomas who filed bankruptcy and stopped the pending foreclosure sale. The Plan of Reorganization that FQP submitted, and that the bankruptcy court formalized through the Confirmation Order, dealt with FQP's bankruptcy status, not Mr. Thomas's.
[¶22] The Consent Order that FQP and MLIC negotiated and signed dealt only with FQP's and MLIC's relationship as it concerned the Little Jennie Ranch. Only FQP and MLIC were parties to this contract. The Consent Order was signed only by FQP's bankruptcy attorney on behalf of FQP. In addition to establishing the amount FQP owed on the Wyoming Judgment as $26,817,815.96, the contract gave FQP until October 31, 2016, to either pay off the outstanding balance or sell the Little Jennie Ranch to satisfy the debt. Mr. Thomas did not sign the contract. Generally, only those who are a party to a contract can obtain the benefits of it. See generally Rogers v. Wright , 2016 WY 10, ¶ 44, 366 P.3d 1264, 1278 (Wyo. 2016). The only mention of Mr. Thomas is in Paragraph 22, which required that he vacate the property "[u]pon termination of the automatic stay," which was set at October 31, 2016. This provision was necessary, not because Mr. Thomas was a party to the Consent Order, but because he was the sole member of FQP. The requirement that he vacate once the bankruptcy court lifted the automatic stay does not make him a party to the contract.
[¶23] As a result of the bankruptcy case, FQP had more time to try to market and sell the Little Jennie Ranch. As it concerned Mr. Thomas, this additional time may have been a benefit to him. That does not, however, make him a party to the bankruptcy case because the bankruptcy court had no authority to reduce or alter Mr. Thomas's personal liability under the Wyoming Judgment. See In re Western Real Estate Fund, Inc. , 922 F.2d 592, 601 (10th Cir. 1990) ("Neither the confirmation of a plan nor the creditor's recovery (of partial satisfaction ) thereunder bars litigation against third parties for the remainder of the discharged debt.") (citing In re Jet Florida Sys., Inc. , 883 F.2d 970, 972-73 (11th Cir. 1989) ; In re Sandy Ridge Dev. Corp. , 881 F.2d 1346, 1350-51 (5th Cir. 1989) ; United States v. Stribling Flying Serv., Inc. , 734 F.2d 221, 223 (5th Cir. 1984) ) (emphasis added) (some citations omitted).[6]
[¶24] The bankruptcy code specifically precludes a bankruptcy court from altering the *112 liability of a non-debtor to the bankruptcy proceeding. See 11 U.S.C. § 524(e).[7]
[A] bankruptcy discharge arises by operation of federal bankruptcy law, not by contractual consent of the creditors and ... [a] creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings[.] Thus, the receipt of payment under the plan does not operate to release non-debtor parties from their obligations to the extent of non-payment. ... [W]hile the Bankruptcy Code expressly alters the contractual obligations of the bankrupt, it does not contemplate the same effect on the obligations and liabilities of third parties to a creditor.
First Fidelity Bank v. McAteer , 985 F.2d 114, 118 (3d Cir. 1993) (internal citation omitted). See Ralph Brubaker, Bankruptcy Injunctions and Complex Litigation: A Critical Reappraisal of Non-Debtor Releases in Chapter 11 Reorganizations , 1997 U. Ill. L. Rev. 959, 971-72 (1997) (" Section 524(e) is necessary, as a matter of mere mechanics, to prevent the debtor's discharge from automatically discharging co-debtors and guarantors, through the operation of common-law suretyship rules that release secondary obligors upon release of the primary obligor.") (citing Hill v. Harding , 130 U.S. 699, 703-04, 9 S.Ct. 725, 726, 32 L.Ed. 1083 (1889) ) (some citations omitted).
[¶25] We addressed a similar issue in Nauman . There, the debtor-company obtained a loan from the creditor. 816 P.2d at 883-84. The Naumans were the sole shareholders of the debtor-company and signed a personal guaranty for the debt to the creditor. Id. at 884. The debt was secured by property in Sweetwater County. Id. A year later, the debtor-company filed for bankruptcy protection. Id. The debtor-company's plan of reorganization called for the creditor to receive 30% less than was owed on the note, in exchange for accelerated payments. Id. The creditor objected to the plan, but the debtor-company and the bankruptcy court utilized the "cram down" provision of the bankruptcy code, which effectively forced the creditor to accept the reduced, accelerated payments.[8] Id.
[¶26] After the bankruptcy case, the creditor sued the Naumans, as the guarantors, for the balance of the note. Id. The Naumans argued that the creditor could not collect on the guaranty because the creditor "voluntarily agreed to accept the accelerated payment." Id. This Court disagreed: "The fact that [the creditor] voluntarily elected to accept an accelerated payment does not determine whether the Naumans' liability as guarantors survived the confirmation of the bankruptcy plan." Id.
[¶27] In addition, 11 U.S.C. § 524(e) expressly states that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." The Naumans also argued that this provision did not apply because the debtor was not "discharged" from the debt under the plan of reorganization; rather, the debtor secured a reduced payment under Chapter 11. See id. at 885. This Court again disagreed because "the effect of a confirmation of the reorganization plan was to accomplish a discharge." Id. (citing 11 U.S.C. § 1141 ). Moreover, "[a] bankruptcy court has no power to discharge the liabilities *113 of a bankrupt's guarantor, even if the creditors consent as part of the reorganization plan." Id. (citation omitted).
[¶28] Mr. Thomas contends that Nauman does not apply because the creditor in Nauman was forced to accept the plan while MLIC voluntarily accepted FQP's plan under the Consent Order. He also argues that Nauman dealt with a discharge while FQP was a Chapter 11 liquidation of assets. We do not find either argument persuasive.
[¶29] First, in Nauman , we expressly recognized that whether a creditor voluntarily accepts a plan is irrelevant as it concerns a non-debtor's liability on a debt. See Nauman , 816 P.2d at 884. Second, the debtor-company in Nauman did not receive a discharge of its debt but rather received a confirmation of its plan of reorganization that reduced its obligation for the debt under 11 U.S.C. § 1141. Id. That is like the situation here where FQP did not discharge its debt to MLIC but reduced its obligation under Chapter 11. The underlying rationale for the holding in Nauman , in addition to the plain language of the bankruptcy code, is that a bankruptcy court does not have the authority to alter a nondebtor's obligations. See Nauman , 816 P.2d at 885. Mr. Thomas does not offer any authority to the contrary.
[¶30] Nevertheless, Mr. Thomas makes several arguments why he must receive the reduced amount FQP secured through the bankruptcy process. Mr. Thomas argues that he is entitled to the reduced amount because he was "personally involved in the negotiations" that led to the Consent Order. He relies on Paragraph 22 of the Consent Order, which required that he vacate the property at the expiration of the automatic stay, to support his contention that, because this "bound" him, he is entitled to all of its benefits. However, this does not alter the fact that Mr. Thomas was not a party to the Consent Order. The requirement that he vacate the property once the automatic stay was lifted was only a recognition that he was the only member of FQP, an entity which did not occupy and could not vacate the property.
[¶31] He also relies on the Confirmation Order and FQP's Plan of Reorganization to support his argument. He points to Section 8.4 of the Confirmation Order which provided:
8.4 Terms Binding/Novation .... [T]his Plan[ ] shall be binding upon [FQP] ... the Guarantor [Mr. Thomas], and all other Persons that are affected in any manner by this Plan, and this Plan shall novate and replace all Pre-petition agreements between the Debtor and such parties, ex[cept] as otherwise provided in this Plan ... or as provided in that certain consent order ... between [FQP] and [MLIC].
(Emphasis added.)
[¶32] Mr. Thomas argues that Section 8.4 novated, or replaced, the original contract that he signed in 2006. A novation is a new contract that replaces an existing contract when all parties to the original contract agree to the terms of the new contract. Lewis v. Platt , 837 P.2d 91, 92 (Wyo. 1992). Section 8.4 did not affect Mr. Thomas's obligations under the original note or the Wyoming Judgment. For one thing, the Consent Order, which is the document that reduced the amount FQP owed under the Wyoming Judgment, is expressly exempted from Section 8.4's novation language: "this Plan shall novate and replace ... ex[cept] as otherwise provided ... in that certain consent order ... between [FQP] and [MLIC]." For another, as noted above, Mr. Thomas was not a party to the Consent Order, and the bankruptcy court did not have the authority to alter his obligation under the note. Finally, under Section 3.2.3 of the Confirmation Order, MLIC expressly preserved its rights against Mr. Thomas under the Wyoming Judgment:
3.2.3 Treatment of Claims in Class 2. ... Except as provided in Section 4.2.9 of the Plan, and in this Order, the Plan shall not be deemed or construed to impair the rights , powers, or remedies available to the Class 2 claimant [MLIC] , whether under the Class 2 claimant's loan, transaction documents, or Pre-Petition Wyoming Judgment , at law, or in equity, against any non-debtor (including, without limitation, any co-maker of any note , any *114 guarantor, or any other co-obligor of the Debtor) with respect to the indebtedness giving rise to the Allowed Class 2 Claim.
(Emphasis added.) "We follow the well-known rule that general provisions in a contract yield to specific provisions[.]" Scherer, II v. Laramie Regional Airport Bd. , 2010 WY 105, ¶ 11, 236 P.3d 996, 1003 (Wyo. 2010).[9] The bankruptcy court's Confirmation Order reaffirmed this: "[T]he Plan preserves the post-judgment remedies of Holders [MLIC] of Allowed Guarantor Claims [Mr. Thomas]."
[¶33] Mr. Thomas next relies on Section 4.2.9, which is the Channeling Injunction referenced in Section 3.2.3 of the Confirmation Order. In bankruptcy, a channeling injunction is a device that constricts another party's actions, be it a creditor or non-debtor, that may negatively impact the debtor's ability to fulfill its obligations under the plan. See A.H. Robins Co., Inc. v. Piccinin , 788 F.2d 994, 1003 (4th Cir. 1986) ; see also 11 U.S.C. § 105.[10]
[¶34] In FQP's Plan of Reorganization and the bankruptcy court's Confirmation Order, the bankruptcy court found that, because FQP and Mr. Thomas "share an identity of interest," a suit against Mr. Thomas is a suit against FQP. Thus, the injunction was necessary to prevent MLIC's collection efforts against Mr. Thomas individually that could negatively affect FQP's ability to fulfill its obligations under the Plan, "until further order of the Bankruptcy Court." That is what Section 4.2.9 did in this case. Contrary to Mr. Thomas's argument, the injunction did not affect MLIC's ability to seek a deficiency judgment against Mr. Thomas. In fact, the injunction specifically provides that the "Plan preserves the post-judgment remedies of Holders of Allowed Guarantor Claims" (i.e., MLIC). This type of injunction does not allow a non-debtor, such as Mr. Thomas, to "cleanse [himself] of ... [a debt] without enduring the rigors of bankruptcy." In re Combustion Engineering, Inc. , 391 F.3d 190, 237 (3d Cir. 2004) ; see also 11 U.S.C. § 524(e).
[W]hile a temporary stay prohibiting a creditor's suit against a nondebtor ... during the bankruptcy proceeding may be permissible to facilitate the reorganization process in accord with the broad approach to nondebtor stays under section 105(a)..., the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor. ... [S]uch a permanent injunction improperly insulate[s] nondebtors in violation of section 524(e) [.]
In re Western Real Estate Fund , 922 F.2d at 601-02.
[¶35] The Channeling Injunction precluded MLIC's collection efforts against FQP and Mr. Thomas until "further order of the Bankruptcy Court." That "further order" came when the bankruptcy court lifted the automatic stay and, thus, the Channeling Injunction, which then permitted collection efforts against Mr. Thomas individually. The provision that "[t]he plan preserves the post-judgment remedies of Holders [MLIC] of Allowed Guarantor Claims [Mr. Thomas]" confirms this intention.
[¶36] Mr. Thomas did not avail himself of the bankruptcy process, FQP did. FQP reduced its obligations under the Wyoming Judgment. Mr. Thomas received an incidental benefit from that process by affording him additional time to occupy and attempt to sell the ranch. Nothing in the Consent and Confirmation Orders, however, altered Mr. Thomas's obligation under the Wyoming Judgment. Moreover, the bankruptcy court was without authority to make any such alteration.
III. Res judicata did not preclude JLC's motion for a deficiency judgment against Mr. Thomas.
[¶37] Mr. Thomas maintains that, even if we conclude that the Consent and *115 Confirmation Orders did not alter his obligation under the Wyoming Judgment, the doctrine of res judicata "bar[s] JLC's deficiency claim ... [because] the claim had been previously decided on its merits in a directly-related bankruptcy case." Mr. Thomas's argument resembles the argument discussed above: that FQP's negotiation of a reduced amount also altered the amount Mr. Thomas owed. The district court concluded that res judicata did not apply because Mr. Thomas was not a party to the bankruptcy case.
[¶38] "Res judicata, also called claim preclusion, bars relitigation of previously litigated claims or causes of action." Tozzi v. Moffett , 2018 WY 133, ¶ 16, 430 P.3d 754, 760 (Wyo. 2018) (citation omitted). For it to apply, there must be "(1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them." Id.[11]
[¶39] Mr. Thomas was not a party in FQP's bankruptcy case. Contrary to Mr. Thomas's contention at oral argument, this case is not like Grynberg v. L & R Exploration Venture , 2011 WY 134, 261 P.3d 731 (Wyo. 2011). In Grynberg , Mr. Grynberg owned Grynberg Petroleum together with his wife, Ms. Grynberg. Id. at ¶ 3, 261 P.3d at 733. Through various suits across multiple jurisdictions, Mr. Grynberg litigated the amount of money his company owed to L & R Exploration. Id. at ¶¶ 6-15, 261 P.3d at 734-35. Ultimately, a New York court found against him. Id. at ¶ 11, 261 P.3d at 735. Later, Ms. Grynberg filed suit in Wyoming against L & R Exploration, where she argued that Mr. Grynberg did not owe L & R anything. Id. at ¶ 13, 261 P.3d at 735. The district court granted L & R summary judgment because Ms. Grynberg's complaint was barred by res judicata based on the prior case. Id. at ¶ 14, 261 P.3d at 735. On appeal, this Court held that "[i]n all of the proceedings ... the issues to be determined were what amounts Mr. Grynberg owed to L & R[.]" Id. at ¶ 27, 261 P.3d at 738. As to whether Ms. Grynberg was a "party" to those prior proceedings, this Court concluded, "[W]hether or not [Ms.] Grynberg is the owner of Grynberg Petroleum or was a party to the joint venture agreement [between Grynberg Petroleum and L & R]" was not relevant because "an order was entered ... finding that Mr. Grynberg owed L & R monies[.]" Id. The Court held res judicata barred her action because "[Ms.] Grynberg is the assignee of Mr. Grynberg's interest in L & R and has no greater rights against L & R than he had."[12] Id.
[¶40] Mr. Thomas relies on Grynberg for the proposition that, JLC, like Ms. Grynberg, could not relitigate what its assignor, MLIC, had already litigated in the bankruptcy case-what FQP owed on the Wyoming Judgment. Grynberg , however, is not analogous to Mr. Thomas's situation. In Grynberg , Mr. Grynberg fully litigated the issue whether he owed money to L & R. Ms. Grynberg "stepped into" Mr. Grynberg's shoes when she became his assignee and, thus, could not relitigate those same issues. In this case, however, Mr. Thomas has not stepped into FQP's shoes. Mr. Thomas is a stranger to the Consent Order, and he is "jointly and severally" liable under the Wyoming Judgment. In addition, MLIC expressly reserved its rights under the Wyoming Judgment against Mr. Thomas in Section 3.2.3 of the Confirmation Order. Under these circumstances, res judicata does not bar JLC's motion for a deficiency judgment against Mr. Thomas.
IV. The district court's deficiency judgment did not credit Mr. Thomas for all payments.
[¶41] Finally, Mr. Thomas asserts that the district court's deficiency judgment is erroneous because it failed to credit him with the $3-million February 2014 payment. We agree. The omitted payment is reflected in the record by MLIC's Notice of Partial Satisfaction of Judgment. In its motion for a *116 deficiency judgment, JLC did not include this payment in its calculations. In Mr. Thomas's response, he specifically listed the $3-million February 2014 payment, although he did not attach the Notice of Partial Satisfaction of Judgment to his response.
[¶42] On appeal, JLC argues that Mr. Thomas did not present this argument to the district court in response to JLC's motion for a deficiency judgment and, thus, waived it on appeal. JLC does not dispute that Mr. Thomas made the payment. Because Mr. Thomas cited the payment in his response to JLC's deficiency motion, the record clearly reflects the payment, and JLC does not dispute that Mr. Thomas/FQP made the payment, we reverse that aspect of the district court's order and remand for it to properly credit Mr. Thomas with the $3-million February 2014 payment.
CONCLUSION
[¶43] The district court did not err when it concluded that the Consent and Confirmation Orders did not alter Mr. Thomas's obligations under the Wyoming Judgment, and that res judicata does not bar JLC's motion for a deficiency judgment. However, the district court did not credit Mr. Thomas with all payments. We therefore affirm in part, reverse in part, and remand this case to the district court to enter an amended order that properly credits Mr. Thomas with the $3-million February 2014 payment.

MetLife assigned its rights under the note to its affiliates: MLIC Asset Holdings, LLC and MLIC CB Holdings, LLC. We will refer to these entities collectively as "MLIC."

MLIC's credit bid was approximately $40,000 more than the Stipulated Amount due as reflected in the Consent Order and Confirmation Order ($26,817,815.96), a fact apparently due to accrued costs and interest through the date of sale.

A deficiency judgment is simply a continuation, or end, of the foreclosure process.
When a deficiency judgment is entered in a foreclosure action, it is a final adjudication of the defendant's common-law liability for the debt. There is in reality but one judgment, the judgment of foreclosure. The so-called deficiency judgment is merely a completion of the judgment upon the coming in and confirmation of the report of sale.
Bank Mut. v. S.J. Boyer Const., Inc. , 326 Wis.2d 521, 785 N.W.2d 462, 473 (2010) (citation omitted).

Mr. Thomas has not raised any issue concerning MLIC's use of the amount that the bankruptcy court ordered FQP to pay as its credit bid in the foreclosure auction. Moreover, the bankruptcy court's Confirmation Order permitted MLIC to do so.

The Confirmation Order required that its terms be interpreted according to Georgia law. In the district court's order granting JLC's motion for a deficiency judgment, it does not appear that the court complied with this provision. Neither party, however, raised this issue below, and they do not raise it on appeal. Moreover, Georgia law on contract interpretation is similar to our own. See Cahill v. United States , 303 Ga. 148, 810 S.E.2d 480, 482 (2018).

Mr. Thomas does not assert that the bankruptcy court had some sort of supplemental, "related to" jurisdiction over the Wyoming proceedings. See Celotex Corp. v. Edwards , 514 U.S. 300, 307 n.5, 115 S.Ct. 1493, 1498 n.5, 131 L.Ed.2d 403 (1995).

Mr. Thomas contends that § 524 does not apply because FQP did not receive a "discharge," rather it received a liquidation under 11 U.S.C. § 1141(d)(3)(A). While the Plan states that FQP did not receive a "discharge," this Court recognized in Nauman that § 524(e) still applies in situations where the debtor receives a confirmation of its plan of reorganization under 11 U.S.C. § 1141. Nauman , 816 P.2d at 885 ; see also 11 U.S.C. § 103(a) (applying the provisions of Chapter 5 to Chapter 11 reorganizations). Moreover, to accept Mr. Thomas's argument would effectively grant him a "discharge" of his debt under the Wyoming Judgment, while his company was precluded from receiving one under § 1141(d)(3)(A) and its plan of reorganization. See Paul R. Glassman, Third-Party Injunctions in Partnership Bankruptcy Cases , 49 Bus. Law. 1081, 1119 (1994). Nowhere in the bankruptcy code is this type of incongruence permitted merely because the company-debtor is liquidated, and Mr. Thomas has not presented any contrary authority.

"Under the 'cram down' provision [of 11 U.S.C. § 1129 ], a dissenting claimant is forced to accept the reorganization plan so long as the minimum standards provided in the statutes are met." Nauman , 816 P.2d at 884 (citation omitted).

FQP's original Plan of Reorganization did not include the highlighted language from Section 3.2.3. That language was added in the bankruptcy court's Confirmation Order after MLIC objected to FQP's original plan.

This is different than a channeling injunction under 11 U.S.C. § 524(g) which "channels" future asbestos claims away from the debtor and to a trust that is set up to compensate those future claims for damages caused by asbestos.

Res judicata's close cousin, collateral estoppel, precludes the relitigation of previously litigated issues. Tozzi , ¶ 17, 430 P.3d at 760.

Apparently, Mr. Grynberg had assigned his rights in the company to Ms. Grynberg. Grynberg , ¶ 9, 261 P.3d at 734.